UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
UNITED STATES OF AMERICA,            :
                                     :     06-cr-991 (JSR)
        v.                           :
                                     :     FINDINGS OF FACT AND
JOEL AUSTIN,                         :     CONCLUSIONS OF LAW
            Defendant.               :
------------------------------------- x

JED S. RAKOFF, U.S.D.J.

On October 2, 2020, this Court held an evidentiary hearing on the petition of the United States Probation Office ("Probation") to revoke supervisee Joel Austin's term of supervised release. Probation charged Austin with (1) criminal sale of a controlled substance in the third degree on August 1, 2020, in violation of New York State Penal Law ("N.Y.P.L.") § 220.39(01) and (2) criminal possession of a controlled substance in the third degree on August 7, 2020, in violation of N.Y.P.L. § 220.16(01). Based on the Court's assessment of the evidence, including its assessment of the witnesses' demeanor and credibility, the Court concludes that the Government has carried its burden with respect to both specifications.

Findings of Fact

On May 3, 2007, Austin pled guilty to being a felon in possession of a firearm, and on August 16, 2007, the Court sentenced him to, inter alia, a term of imprisonment of 15 years and a term of supervised release of 3 years. On December 5, 2017,

the Court granted Austin's motion pursuant to 28 U.S.C. § 2255, reducing his prison sentence to time served. Order Granting § 2255 Motion, ECF No. 42. Since then, Austin has been serving his term of supervised release, which is set to expire December 4, 2020. He is subject to, <u>inter alia</u>, the mandatory conditions of supervised release, including that he "shall not commit another federal, state or local crime." Judgment, ECF No. 19, at 3.

At the evidentiary hearing, the Government's principal witness, New York City Police Department Officer Randys Ramos Luna, testified that he observed Austin engage in a hand-to-hand sale of cocaine during the early morning hours of August 1, 2020, and that he saw Austin again on August 7, 2020, in the same vicinity, recognized him as the man who had sold cocaine on August 1, and arrested him, finding at that time 11 vials of cocaine in Austin's pocket.

I.   Specification 1: Sale of Cocaine on August 1, 2020

With respect to the first specification, Officer Ramos Luna testified that he has observed dozens of narcotics transactions during his career. Evidentiary Hearing Transcript, ECF No. 83 ("Tr."), at 5. He testified that at approximately 1:25 a.m. on August 1, 2020, he and Sergeant Louis Meade were sitting in a parked car near the corner of West 124th Street and St. Nicholas Avenue. Tr. 5-9. He testified that he saw a black man who "gave

-2-

a small object to multiple people at the location, and in exchange he received money." Tr. 9.

Officer Ramos Luna further testified that the scene was illuminated by electric lighting affixed to scaffolding nearby, Tr. 8, and that he had "a clear view of [the seller's] face." Tr. 8-9. Officer Ramos Luna testified that he saw this man again on August 7, 2020, and, recognizing him, arrested him. It was Joel Austin. Tr. 22.

Going back to the events of August 1, Officer Ramos Luna's partner in the police vehicle, Sergeant Meade, testified that he saw a black man on the street but did not see a narcotics transaction. Tr. 111. He testified that he did not get a good look at any of the man's identifying features and could see nothing other than his gender and race. Tr. 115.

Officer Ramos Luna testified that, less than a minute after the transactions, he and Sergeant Meade left the vehicle and approached two women. Tr. 11-12. Officer Ramos Luna ordered one of the women, whom he later learned to be Rhina Rosario, to "give [him] the vial." GX 301T at 2-3. She eventually gave him a red plastic vial which she had been holding in her right hand, Tr. 12, but she protested that the officer should "arrest the one who sells it, not [her]," id. at 12, since she was only "buying something," id. at 6. Officer Ramos Luna vouchered the vial he received from Rosario, Tr. 15, and the Court received it into evidence. GX 103.

The parties stipulated that NYPD Police Laboratory Criminalist Frank DiRico would have testified, if called, that he analyzed the vial and concluded that it contained cocaine. GX 104.

The defense offers no real argument that Officer Ramos Luna did not observe a hand-to-hand sale of cocaine on August 1, 2020. Rather, the defense principally contends that Officer Ramos Luna's eyewitness identification is neither accurate nor adequate. While Officer Ramos Luna expressed certainty that the man he arrested on August 7 is the same man he saw on August 1, "[o]verconfidence may be the most pernicious problem with eyewitness testimony, since even very poor-quality information can influence decision and action if communicated to others with certainty." Albright & Rakoff, A Clearer View: The Impact of the National Academy of Sciences Report on Eyewitness Identification, 104 JUDICATURE 20 (2020).

Austin offers three principal reasons why the Court should not credit Officer Ramos Luna's eyewitness identification. First, Austin argues that environmental factors on August 1 limited Officer Ramos Luna's ability to effectively observe the transaction. It was nighttime, and, based upon Sergeant Meade's testimony, the officers may have been as far as 60 feet away from the transaction. Tr. 115. Moreover, Austin argues that the officers' estimates of their car's location were quite different, showing that their memories were imprecise. And Austin points out

that Sergeant Meade saw a black male but was unable to identify any features beyond his race and gender. Id. The Court agrees that these are pertinent factors that somewhat diminish the reliability of Ramos Luna's eyewitness identification.

Second, Austin points out that Officer Ramos Luna did not turn on his body camera or use his cellphone camera to capture the transaction.[1] Officer Ramos Luna testified that he was in uniform in a car with clear windows and that movement could have drawn attention to himself. Tr. 36. He also explained, "We are not required to take a picture." Id. This may be so, but it is still troubling. Here we have an officer in the field, wearing a body camera, for the specific purpose of conducting drug investigations. If he is not required to leave his body camera on, the result (as in this case) is entirely predictable: the camera captures the aftermath (here, conversations with Rosario, the buyer), but not the main event. Nevertheless, the Court must work from the evidence presented, and the Court finds Officer Ramos Luna's explanations for why he did not turn on his camera to be credible.

Third, Austin argues that Officer Ramos Luna's decision to approach and arrest Ms. Rosario, a misdemeanant, while taking no action to apprehend the seller, a felon, reveals that he lacked

---

[1] Sergeant Meade was not wearing a body camera. Tr. 113.

-5-

sufficiently specific information to pursue the felon. Austin notes in this regard that Officer Ramos Luna offered no description to Sergeant Meade beyond "black male," did not announce a description of the seller on his radio, did not anywhere record details regarding the suspect besides his race and gender, and did not search mugshots or otherwise take any steps to investigate the seller until he saw Austin on August 7, 2020.

The Court nevertheless concludes that Officer Ramos Luna offered a credible justification for pursuing the buyer rather than the seller: the seller had already left and there was not enough manpower to immediately pursue both. Tr. 11-12. Furthermore, the buyer would definitely have narcotics in her possession and the seller might not. Tr. 42. Officer Ramos Luna did not, however, offer a persuasive explanation for nowhere recording the seller's physical characteristics (beyond race and gender). The Court concludes that the failure to make any contemporaneous record of the suspect's appearance somewhat diminishes the reliability of Officer Ramos Luna's eyewitness identification.[2]

---

[2] The Court rejects Austin's further argument that Officer Ramos Luna's descriptions of Austin's complexion have varied over time. See Tr. 55-59. There is nothing inconsistent about describing a person's skin tone as dark, meaning that he is black, but also saying that he is a black male with light skin, meaning that his skin tone is relatively light for a black person.

-6-

In sum, while the Court basically credits Officer Ramos Luna's testimony, it has sufficient doubts about the reliability of the officer's eyewitness identification of Austin on August 1 that, if there were nothing more, the Court would not find that the Government had carried its burden on the first specification. But there is more.

To begin with, the Government introduced cell phone records for a phone number (the "Austin Cellphone"). GX 203. The records list Austin as the subscriber, GX 203, and show five phone calls between the Austin Cellphone and a second cell phone on July 31, 2020, the day prior to the hand-to-hand sale, including one call about six hours prior to the sale. Id.; GX 211.

The second cell phone belonged to Rosario or someone known to Rosario. Specifically, Officer Ramos Luna testified that Rosario provided him with her phone number when he was completing the arrest paperwork, and that this phone number was the phone number with which the Austin Cellphone had contact five times on July 31. Tr. 20; see GX 203. The Government argues that this shows that Austin had phone contact with Rosario only a few hours before Rosario purchased cocaine, corroborating Officer Ramos Luna's testimony that Austin was the seller.

The defense responds that the Court should not consider this evidence. Rosario's statement that this was her phone number is hearsay if offered to show the truth of the matter, and while

-7-

hearsay can sometimes be admitted at supervised release hearings, the Government represented that it was not seeking to elicit this testimony for the truth of the matter. Tr. 19 ("It's not hearsay. It is not offered for the truth. It is offered for the fact this was the number she provided to the police.").[3] But Rosario's statement that this was her phone number, even if not accepted for its truth, still shows, from the very making of the statement, that she <u>knew</u> the number. Therefore, either Rosario or someone whom she knew well enough to have that person's phone number memorized was in touch with Austin several times on the day before the sale. Because the evidence demonstrates that Austin was in touch with Rosario or a close associate of hers not long before the sale, this corroborates Officer Ramos Luna's eyewitness identification.

The Government also offered the expert testimony of Reginald Donaldson, an investigative analyst at the United States Attorney's Office for the Southern District of New York. Donaldson testified that he examined cell site location data

---

[3] The Government later added another argument, that there would be "good cause to offer it here for the truth . . . because Ms. Rosario is unavailable. If she were called to testify, she would likely invoke her Fifth Amendment rights against self-incrimination." Tr. 20. Because the Court had already relied on the Government's representation that it was not seeking to introduce the evidence for the truth of the matter asserted, it will hold the Government to that representation and not accept this later argument.

obtained from the cell phone provider for the Austin Cellphone. Tr. 84-93, which showed that the Austin Cellphone was in the vicinity of the alleged transaction during the period 1:00 to 2:00 a.m. on August 1, 2020, Tr. 91-92. Donaldson testified that the cell site location data is accurate to "within maybe a few blocks," Tr. 86.  (In this regard, Officer Ramos Luna testified that Austin provided his home address following his arrest, Tr. 27; that address is approximately 1.65 miles from the vicinity of the alleged transaction.  Tr. 98; GX 210.)  Based upon Donaldson's testimony, which the Court credits, the Court concludes that the Government has established that it is very likely that the Austin Cellphone was within a several-block radius of the drug sale at the time the sale occurred on August 1, 2020.  This further corroborates Officer Ramos Luna's eyewitness identification.

Putting this all together,[4] the Court concludes that, notwithstanding the questions that one might otherwise have about Officer Ramos Luna's identification of Austin as the person he saw sell cocaine on August 1, when one adds the additional corroborative testimony of Donaldson and the inferences to be drawn from Rosario's making the hearsay statement about her phone, the Government has met its modest burden of proving by a preponderance

---

[4] The Court also accepts the undisputed stipulated testimony of NYPD Criminalist DiRico that the vial contained cocaine.  GX 104.

of the evidence that Austin knowingly and unlawfully sold cocaine on August 1, 2020.

II.  Specification 2: Possession of Cocaine on August 7, 2020

With respect to the second specification, Officer Ramos Luna testified that he was again conducting surveillance in the vicinity of St. Nicholas Avenue and 124th Street at 11:00 p.m. on August 7, 2020, when he saw Austin and recognized him as the man he had observed selling cocaine on August 1, 2020.  Tr. 21-22.  Officer Ramos Luna testified that he arrested Austin and searched him, finding cash in his hand and 11 plastic vials in his pocket.  Id. 23.  During a second search, he found additional cash; in total, he seized $403 in mostly small bills.  Tr. 24-25.  Officer Ramos Luna further testified that he delivered the vials to the precinct.  Tr. 23.  The Court received them into evidence.  GX 101.  The parties stipulated that NYPD Police Laboratory Criminalist Degbundit Trakansook would have testified, if called, that he analyzed a composite sample obtained from the vials and concluded that it contained cocaine.  GX 104.

Austin argues that this testimony should not be credited for three reasons.  First, Austin argues that Officer Ramos Luna's testimony is uncorroborated.  The Government did not call any of the other officers on the scene or introduce body camera footage.  Tr. 73-74.  On cross-examination, Officer Ramos Luna conceded that the body camera footage would not show him pointing the camera at

-10-

the drugs or announcing that he had discovered drugs. Id. Austin notes that Officer Ramos Luna also searched other places besides Austin's pockets, such as a nearby awning, insinuating that the cocaine could have come from elsewhere. In essence, Austin is accusing Officer Ramos Luna of lying. The Court, based upon the evidence and Officer Ramos Luna's demeanor, rejects this argument.

Second, Austin argues that the Government did not connect the vial seized on August 1 and the vials seized on August 7. He points out that the vials' caps had different colors and that the substances were never compared with one another. But this is irrelevant; whatever their provenance, the point is that the vials contained cocaine, something Austin does not dispute.

Finally, Austin argues that the Government has not shown that he intended to sell the cocaine in his possession. He argues that the 11 vials in his pocket could have been for personal use. The quantity is middling enough to make that a slight possibility, but this argument is belied by the $403 the NYPD seized from Austin: 88 $1 bills, 15 $5 bills, 5 $10 bills, and 7 $20 bills. Tr. 25. Furthermore, Probation tested Austin for drug use, including cocaine, a total of 17 times between January 2018 and May 2019, and he tested negative each time. GX 105. He also tested negative on August 11, 2020, four days after his arrest. Id. Therefore, more likely than not, Austin intended to sell this cocaine.

In sum, based upon the totality of the evidence,[5] the Court finds, by a preponderance of the evidence, that Austin knowingly and unlawfully possessed cocaine with intent to sell it on August 7, 2020.

## Conclusions of Law

"A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells . . . a narcotic drug." N.Y.P.L. § 220.39(01). "'Narcotic drug' means any controlled substance listed in schedule I(b), I(c), II(b) or II(c) other than methadone." N.Y.P.L. § 220.00(07). Cocaine is listed in Schedule II(c). See New York Public Health Law § 3306.

Based upon the Court's findings of fact, as stated above, the Court concludes that the Government has carried its burden to demonstrate, by a preponderance of the evidence, that Austin knowingly and unlawfully sold cocaine on August 1, 2020, thereby committing criminal sale of a controlled substance in the third degree, a class B felony, and violating a condition of his supervised release.

"A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses . . . a narcotic drug with intent to sell it." N.Y.P.L.

---

[5] The Court also accepts the undisputed stipulated testimony of NYPD Criminalist Trakansook that the vials contained cocaine. GX 104.

§ 220.16(01). Based upon the Court's findings of fact, as stated above, the Court concludes that the Government has carried its burden to demonstrate, by a preponderance of the evidence, that Austin knowingly and unlawfully possessed cocaine with intent to sell it on August 7, 2020, thereby committing criminal possession of a controlled substance in the third degree, a class B felony, and violating a condition of his supervised release.

Because the Court finds that the Government has carried its burden on both specifications, a sentencing hearing will be held on Tuesday, December 1, 2020, at 4:00 p.m.

SO ORDERED

Dated:   New York, NY
         November 18, 2020

_____
JED S. RAKOFF, U.S.D.J.